**AFFIRM; Opinion Filed April 16, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-11-01334-CR**

**PAUL THOMAS GILLAM, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-47328-U**

## OPINION
Before Justices Francis, Lang, and Evans
Opinion by Justice Lang

Following a plea of not guilty, appellant Paul Thomas Gillam was convicted by a jury of murder. Punishment was assessed by the jury at sixty-five years' imprisonment. On appeal, appellant asserts six issues. Appellant contends the evidence is (1) insufficient to support the conviction for murder and (2) not legally or factually sufficient to support the jury's negative answer to the "special issue" that inquired whether appellant acted under the influence of sudden passion arising from an adequate cause. Additionally, appellant argues the trial court erred by (1) excluding certain evidence "relative to the relationship of the parties," (2) excluding relevant expert witness testimony during the guilt/innocence phase of trial, and (3) refusing to instruct the jury on the affirmative defenses of self-defense and defense of a third party.

We decide appellant's six issues against him. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Melanee Knouse testified during the guilt/innocence phase of trial that at the time of the events giving rise to this action, she and the complainant, Dana Swindle, had been involved in a romantic relationship for approximately five months. According to Knouse, Swindle had two sons and a three-year-old daughter, Jaelyn. Jaelyn lived with Patricia Gant, her paternal grandmother, who was married to appellant.

Knouse testified that in the week prior to the events in question, a Dallas court had awarded custody of Jaelyn to Swindle. According to Knouse, the Dallas court that had made that custody determination believed Gant and appellant were living in Missouri. However, Knouse testified, Swindle learned they were living on Amherst Drive in Rowlett, Texas. Knouse stated that Swindle contacted authorities and provided that information, but "there was nothing they could do." A few days before the events in question, Knouse accompanied Swindle to the Rowlett police station, where Swindle filed a report alleging interference with a custody agreement.

Knouse testified that on April 22, 2010, she and Swindle visited the address where Gant and appellant were living "in order to take pictures to prove that they did not live in Missouri and that they lived here in Texas." On that day, Knouse said, they drove slowly down Amherst in her truck while Swindle took photographs of the house with her cell phone from the front passenger seat. Knouse and Swindle "asked a gentleman if a lady and a man and child lived in there," but the person they questioned "didn't say yes or no." Then, Knouse began turning around because the road dead-ended. At that point, appellant pulled up in his truck and parked in the driveway of the house. Knouse testified Swindle continued taking photographs from the passenger seat. The man Knouse and Swindle had questioned spoke with appellant. Then, Knouse testified, appellant "came at us while we was in the truck." According to Knouse,

–2–

appellant told them they had no right to take photographs of the house. Knouse testified appellant "reached through the window and him and [Swindle] had a scuffle and he took the cell phone that we was taking pictures with." Then, appellant "walked away" and went into the house.

Knouse testified that as appellant walked away, Swindle got out of the truck and asked two men standing nearby if she could have use of a cell phone to call 911. Knouse could not recall whether Swindle said anything to appellant after getting out of the truck, other than telling him she was calling 911. Knouse stated Swindle stood in the yard of the house next door to appellant's and placed a 911 call. Knouse testified Swindle was not standing on appellant's property. While Swindle was talking on the phone, appellant came out the front door of his house and headed toward Swindle. According to Knouse, appellant was "just kind of walking." Knouse testified Swindle "turned around and told him to stop that she was on the phone with 911." Then, Knouse stated, Swindle "turned back around and was fixing to talk." Knouse stated that at that point, appellant pulled a gun from behind his back and shot Swindle several times. According to Knouse, Swindle was not facing appellant at the time she was shot. Knouse testified that after the second or third shot, Swindle fell to the ground face-first. Knouse stated that appellant shot Swindle two or three more times while she was on the ground. Then, appellant turned and went back toward his front door. Knouse stated Swindle did not threaten anyone and did not have a gun.

Over objections by appellant, an audio recording of Swindle's 911 call was admitted into evidence and played for the jury. Additionally, photographs taken at the scene before and after the shooting were admitted into evidence, including a photograph of appellant's residence and several photographs of the yard of the house next door to appellant's where Swindle was standing when she was shot. Knouse described what was shown in each one.

–3–

On cross-examination, Knouse testified Gant and appellant took custody of Jaelyn when Swindle went to prison for a drug charge. After Swindle was released from prison, she sought to regain custody and was in the process of doing so when she and Knouse met. Knouse testified that although Swindle had obtained an order on approximately April 14, 2010, that allowed her custody of Jaelyn, a "change in the potential circumstance" respecting that custody order occurred on the date of the events in question. Specifically, Knouse testified, prior to the time she and Swindle went to appellant's house on April 22, 2010, a Dallas court had put the order awarding custody of Jaelyn to Swindle "on hold" until "an official hearing down the road." Knouse testified that, in retrospect, she put herself in a dangerous situation "by going in front of a house that somebody was in a heated custody battle over a baby girl."

Phillip Parker testified that at the time of the events in question, he lived about two doors down from appellant on Amherst Drive. He had seen appellant occasionally with a little girl. Parker said that on April 22, 2010, he was asked by Swindle whether he knew anything about the people living in appellant's house. He answered that he had seen them a couple of times. Parker stated that Swindle "left" and he went into his house. Then, Parker testified, he came back out and saw Swindle and another woman "coming back." He stated that Swindle was taking pictures of appellant's house.

At that point, Parker stated, appellant came home. Parker told appellant about the two women taking photographs. Parker testified appellant asked him what they were driving. Parker pointed out the vehicle to appellant. According to Parker, appellant went over to the women, hit Swindle, and took a phone from her. Parker did not hear appellant say anything to the women. Parker testified Swindle asked appellant what he was doing and told him, "You can't do that." Then, Parker testified, appellant walked into his house. Parker stated he heard Swindle tell appellant she wanted her phone back. He did not hear Swindle say anything else.

–4–

Parker stated Swindle got out of the car, ran over to where he was standing with his neighbor, Cory, and asked to use a cell phone. Parker testified Cory gave Swindle a cell phone and she called police. Parker stated appellant came back outside and walked over to Swindle. She was talking to police on the phone. According to Parker, appellant said "well, you ain't got to worry about it no more." Then, Parker testified, appellant pulled out a gun and shot Swindle in the arm. Parker stated appellant was "maybe four or five feet" away from Swindle. Parker testified Swindle started to run away and appellant shot her again in the top of the back. Parker testified Swindle fell down and appellant "walked over and shot her some more." Parker stated he asked appellant, "[W]hat are you doing?" Appellant looked at him, then walked back toward his house. Parker testified it did not seem to him at any time that appellant was in danger of being hurt by Swindle.

Cory Gayford testified he lived on Amherst Drive in Rowlett at the time of the events in question. Before the date of the shooting, Gayford had spoken to appellant a couple of times. Gayford testified that in the afternoon on April 22, 2010, Parker told him about "some lady" taking pictures of appellant's house. Gayford and Parker saw appellant pull up and went over to tell him somebody had been taking pictures. Then, Gayford testified, "the lady pulled up again." Gayford stated appellant "went down to the vehicle" and started arguing with Swindle. According to Gayford, Swindle did not yell anything to appellant before appellant approached the vehicle. Gayford testified appellant and Swindle "started fighting over a phone." Gayford stated appellant seemed angry. He testified appellant wrestled with Swindle and appeared to strike her several times. Then, Gayford stated, appellant walked back toward his house with the phone in his hand. Gayford testified that right after appellant started walking toward his house, Swindle left the vehicle and approached him and Parker to request use of a cell phone. Gayford gave Swindle his cell phone and she called police. While she was on the phone, appellant

–5–

approached her from the direction of his house. Gayford testified Swindle told appellant, "I just want my kid back" and appellant replied, "[Y]ou don't have to worry about that no more." Then, according to Gayford, appellant "reached behind his back in his pants and pulled the gun out." Gayford testified appellant shot Swindle in the arm and then in the back. He stated Swindle fell to the ground and appellant shot her several more times. Gayford testified it did not seem to him that appellant was in danger from Swindle at the time he began shooting.

On cross-examination, Gayford testified he did not hear anything said by appellant or Swindle prior to the time Swindle left the vehicle.

Guadalupe Christensen testified that on April 22, 2010, she was in the yard of her home on Stanford Street in Rowlett, which intersects with Amherst. Christensen said she heard a commotion "across the street." She stated she heard loud voices, but could not make out the words that were being said. She testified she saw her neighbor pull up in front of his house in his truck at the same time a "white SUV" pulled up in front of a different house. She stated she saw her neighbor go into his house, which she testified was the same house in the photograph admitted into evidence earlier in the trial that was identified by Knouse as appellant's house. Christensen testified a woman passenger from the white SUV asked some people standing nearby if she could borrow a cell phone. According to Christensen, her neighbor came back out of his house a short time later with a gun. At that point, Christensen testified, the woman from the white SUV was talking on the phone. Christensen stated her neighbor said something to the woman, shot the woman about five times, and went back into his house. She stated she did not at any point in time see the woman from the white SUV attack her neighbor or go toward him.

Officer Shawn Fuller testified he was working as a patrol officer for the Rowlett Police Department on April 22, 2010. He stated that at approximately 3:30 p.m., he responded to a "disturbance possibly involving a weapon" on Amherst Drive. It took him about thirty to forty

seconds to reach the scene. He testified he saw Swindle lying beneath a tree, bleeding. He stated that "quite a few" people were standing nearby. Fuller stated that Knouse told him Swindle had a pulse, but was not breathing, and Fuller told Knouse to start CPR, which she did. Fuller testified he was told by a neighbor that the shooter had gone into his house at 7314 Amherst Drive. Additionally, Fuller stated he overheard "kids" nearby saying that the suspect had gone into the alley and that he still had a gun in his hand.

According to Fuller, several other officers arrived a few minutes later. At that point, Fuller testified, he and a detective approached the front door of appellant's house and announced themselves. The door was opened by Gant. She gave them consent to enter and search the house. Fuller stated he saw an empty holster and a cell phone on the floor in a bedroom. He stated Gant and "her daughter" were the only people in the house.

Fuller testified that later on, after appellant had been found in another location and was in custody, he and other officers searched for evidence along the pathway they believed appellant had taken after the shooting. Fuller stated that in some bushes near the lake at a nearby park, they found a blue "scrub top," which matched the description of what appellant had been wearing.

Rowlett Chief of Police Matt Walling testified that when he heard the report of a shooting on Amherst on April 22, 2010, he and a lieutenant headed to the general location to see if they could locate the suspect. Walling testified that "just probably southwest" of the scene, they saw appellant walking toward them from the direction of a nearby lake. According to Walling, appellant was wearing hospital scrub pants and a white t-shirt. Walling testified he asked appellant if he knew why they were there, and appellant responded "yes." Then, Walling asked appellant where the gun was located. Walling testified appellant stated he was just out jogging. Walling and the lieutenant detained and handcuffed appellant.

–7–

On cross-examination, Walling testified appellant was cooperative when they found him and did not threaten them. Walling stated appellant was out of breath and limping.

Sergeant Daniel Miller, a patrol sergeant with the Rowlett Police Department, testified he was called out for a crime scene search after the shooting in question. Photographs of the crime scene taken by Miller on the date of the shooting were admitted into evidence and he described the items in those photographs. Miller testified a cell phone, a hearing aid, shell casings, and pools of blood were found in the grass near a tree. Additionally, he stated that a leather holster, cell phone, and cell phone backing were found inside appellant's residence. Miller testified that all shell casings found at the scene were from .45 caliber ammunition.

Dr. Reade Quinton, a medical examiner for Dallas County, testified that he conducted an autopsy on Swindle on April 23, 2010. The cause of death was multiple gunshot wounds. Quinton stated there were five gunshot wounds on the body: one on the left shoulder, one on the right side of the abdomen, one through the right side of the back and the right arm, and two on the back. According to Quinton, the wound on the left shoulder was "front to back," meaning it originated from the front of the body, and the other four wounds were "back to front." He stated that two of the wounds went through Swindle's heart and either one of those would have caused death very quickly. Additionally, Quinton testified Swindle tested negative for drugs and alcohol. Photographs from the autopsy were admitted into evidence over appellant's objection.

David Waters, a detective with the Rowlett Police Department, was called to testify by the defense. Waters stated that prior to April 22, 2010, he spoke with Swindle more than once about custody issues involving Gant and appellant. He testified that approximately a year before the incident in question, Swindle contacted him because she wanted to file charges based on an altercation between her and Gant. No charges were filed respecting that altercation. Further, Waters stated he did not proceed with charges respecting other custody complaints by Swindle

–8–

because he was waiting for the family civil courts to resolve those custody issues. Waters testified that on April 22, 2010, he met with Swindle and recommended that Swindle not go to appellant's house in order to avoid any conflict.

Gant testified she married appellant in 2000 and they moved to Texas in 2005. Gant stated that Jaelyn is the daughter of her son John and Swindle, who never married. John and Swindle lived with Gant and appellant intermittently until summer 2007. Gant testified she received full custody of Jaelyn when Swindle was arrested in November 2008. According to Gant, Swindle was released in April 2009, but Gant continued to raise Jaelyn. Swindle was allowed supervised visits with Jaelyn. In March 2010, Gant testified, she discovered Swindle was seeking custody of Jaelyn.

During direct examination of Gant by appellant's counsel, the State objected to Gant's testimony pertaining to her relationship and interactions with Swindle on the grounds of relevance and hearsay. Outside the presence of the jury, appellant's counsel asserted in part that the testimony was admissible pursuant to (1) Texas Rule of Evidence 404, because it was "evidence of a character trait of the victim of the crime offered by an accused" and (2) "3836" of the code of criminal procedure because the testimony "described the family dynamics in the situation" and "goes to the state of mind" of appellant. Additionally, appellant's counsel argued the "theory of self-defense" had been raised by the evidence. The trial court heard argument as to the admissibility of the disputed evidence, which included Gant's testimony respecting (1) a 2009 "pushing incident" involving Gant and Swindle, (2) a death threat made by Swindle to Gant during a phone call in 2009, (3) drug use by Swindle reported to Gant by another person, (4) Swindle "spending time with people of dangerous character," and (5) Swindle driving down the alley behind Gant's house several times with a person who had a criminal history. The trial court ruled, in part, that the 2009 "pushing incident" described by Gant was admissible. Additionally,

the trial court sustained the State's hearsay objection as to anything Gant "heard from other folks" and ruled that the other disputed testimony was not admissible "at this point" because it concerned the state of mind of Gant and not appellant. Further, the trial judge stated that self-defense had not been raised by the evidence at that point, but "[i]f some other evidence comes out, I will reconsider it." Then, the jury returned to the courtroom and Gant's testimony resumed.

Gant stated that in 2009, there was a physical confrontation between her and Swindle and the police were called. Gant testified she felt "threatened" by Swindle at that time. In July 2009, Gant and appellant moved to Missouri. Gant stated they moved back to Texas in February 2010 and lived on Amherst in Rowlett.

Gant testified that in April 2010, she learned that a judge had awarded Swindle custody of Jaelyn, who was still living with Gant and appellant. Gant stated she was surprised because she had not received notice of any custody hearing. She contacted a lawyer and challenged the custody order. According to Gant, she and appellant were "constantly worried" during that time and could not eat or sleep well due to stress from the custody matter.

Gant stated that on April 22, 2010, she called appellant at his work place and told him a stay had been granted on the custody order. She testified she was upset because she thought the stay meant that Swindle had custody of Jaelyn. Gant stated appellant's tone indicated he was upset. According to Gant, when appellant came in the house after work, he was "very upset." She stated he looked physically pale and "scared, crazy." She testified she had never seen him like that and knew something was wrong. Appellant was in the house for only seconds, went into a room, and came out of the room with what she thought might be a gun. Then, Gant testified, appellant ran out the door. Gant grabbed a cell phone and called 911. Gant stated she was scared because she did not know what was going on.

Timothy Lucius testified he supervised appellant during the time appellant worked at Mesquite Specialty Hospital. Lucius stated appellant was generally "very helpful" and "very respectful" and was one of his best workers. According to Lucius, sometime after breakfast on April 22, 2010, appellant appeared to be "very disturbed" and "very distraught." Appellant was breathing "very fast" and was "very clammy, sweating." Lucius stated he had not seen appellant that way before. He testified it appeared to him that appellant was "very anxious" to get home. He told appellant he could not let him leave right away because he did not feel safe about letting appellant on the road at that time due to appellant's "behavior." Lucius gave appellant something to drink and told him to rest a little bit. Lucius stated appellant left about fifteen minutes later.

Appellant testified that at the time of the events in question, he worked at Mesquite Specialty Hospital assisting nurses with patient care. He stated that while Swindle lived with him and Gant, there was contention between him and Swindle and between Gant and Swindle. According to appellant, he and Gant took over the care and raising of Jaelyn in 2008 because Swindle was incarcerated. He stated that after Swindle was released from incarceration, he was worried about Swindle's ability to care for Jaelyn based on Swindle's history and behavior. Additionally, appellant testified he feared violence by Swindle against Gant based on the 2009 altercation involving Gant and Swindle and on "information" given to him by Gant that the trial court did not allow him to elaborate on. Appellant stated he felt there "was a likelihood of a confrontation" between Gant and Swindle and "knew should such a confrontation take place, [Gant] would be at the losing end." He worried about Gant's "well-being" and safety.

According to appellant, Swindle was released from incarceration in 2009. In April 2010, appellant and Gant discovered there had been a hearing and Swindle had been given "sole managing custody." Appellant stated he and Gant were in shock because they had received no

–11–

notice of the hearing. He stated he felt the custody order had been obtained through fraudulent means. He and Gant immediately contacted their attorney. Appellant testified that subsequent to the issuance of the custody order, he spoke with Swindle by phone several times regarding custody of Jaelyn and Swindle seemed "angry and belligerent." Appellant testified he felt "lost, powerless." Additionally, he stated he felt a lot of anxiety and uncertainty and a "feeling of hopelessness." He stated he became unable to sleep, had terrible dreams, became "kind of reclusive," and constantly worried about Jaelyn's well-being. Further, appellant testified he was trying to quit smoking at that time and was taking an "antismoking" drug called Chantix.

Appellant testified that while he was at work on April 22, 2010, he received a phone call from Gant, who was crying. Appellant stated that after hanging up the phone, he believed he was having an anxiety attack. He told his supervisor that he had an emergency at home and needed to leave. When appellant pulled into the driveway at his home, he saw two young men standing in his yard. Appellant testified he had a conversation with the two young men that caused him concern and caused him to fear for his wife. One of the men pointed and appellant turned around and saw an SUV parked by the mailbox in front of his house. Swindle was in the SUV "doing something with her phone" and someone else was driving. Appellant stated he "was in shock" and then felt anger and fear "for [Gant's] safety and of losing the baby." He approached the SUV and yelled at Swindle to stop taking pictures and get "out of here." Swindle did not leave. Appellant testified he and Swindle struggled over Swindle's phone and he discovered she had been taking photographs of him and his family. After taking Swindle's phone, he walked away from the vehicle. According to appellant, Swindle stepped out of the vehicle into his yard and said, "Give me my phone back you son-of-a-bitch." Further, appellant testified Swindle said, "I'm taking Jaelyn. I'm taking my daughter." Appellant looked at the

photographs of his vehicles and house on the cell phone as he walked toward his front door. Appellant testified that "everything felt surreal" at that point and felt "like a dream."

Appellant stated he went into his house and grabbed "the weapon." He stated he "felt like a robot." He went back outside. According to appellant, "[n]othing felt real." He testified he leveled the gun and "fired, and fired, and fired." Appellant stated he felt he was protecting his wife and the baby and was "just reacting."

On cross-examination, appellant testified he did not know whether he intended to kill Swindle and did not know he fired five times. He stated he felt that "[Swindle] being on the property or even near my house was a threat." According to appellant, after shooting Swindle, he walked through his house to his back yard. Then, he "just walked" and found himself at the lake. He testified he was "pretty sure" he left the gun on a planter in his back yard before he walked toward the lake. He stated he did not see his wife when he walked through the house.

Following appellant's testimony, the trial court held a hearing outside the presence of the jury to determine the admissibility of the testimony offered by appellant of Dr. Ray McClung, a clinical psychologist appointed by the trial court to evaluate appellant. Counsel for appellant asserted McClung's testimony was being offered under "3836, both (a) and (b) 2" of the code of criminal procedure to "shed light on the condition of the defendant's state of mind at the time of the offense as related to his family and domestic issues that he had had and his wife had had with [Swindle], the victim, in this case because of prior activities of [Swindle], threats of [Swindle], that played into the condition of my client's state of mind at the time of the event that took place, and directly relates to his defensive mechanism to protect his wife and child." After hearing a summary of McClung's proffered testimony, including, in part, his testimony that Chantix can cause violent behavior in some users, the trial court ruled McClung's testimony would not be allowed during the guilt/innocence phase of trial. However, the trial court ruled that if appellant

were found guilty, McClung's testimony would be allowed during the punishment phase on the issues of mitigation and sudden passion.

At that point in the trial, counsel for appellant reoffered, over objection by the State, Gant's testimony that had been excluded earlier respecting the death threat made by Swindle to Gant in 2009. The trial court overruled the State's objection, and Gant was recalled as a witness in the jury's presence.

On recall, Gant testified that in approximately May 2009, she had a "heated" phone conversation with Swindle in which Swindle said Gant had no right to have Jaelyn and told Gant she was going to get her daughter back. According to Gant, Swindle told Gant she would kill her in order to get Jaelyn back. Gant testified she felt concern and fear and told appellant about the conversation. On cross-examination, Gant stated she reported Swindle's assault against her to Swindle's probation officer. Gant testified she did not tell Swindle's probation officer about the threatening phone call. Following this testimony by Gant, the defense rested its case.

On rebuttal, the State called Myra Kirkwood, a United States probation officer in the Eastern District of Texas, Plano Division. Kirkwood testified she met Swindle in 2005 when Swindle commenced a term of supervised release and began reporting to Kirkwood's office. Kirkwood stated she has visited with Swindle in the probation office and during field contacts in the community. According to Kirkwood, Swindle "never tested positive for any elicit [sic] drug." Kirkwood stated Gant called the probation office several times to report drug use by Swindle, but Swindle tested negative each time. Further, Kirkwood testified she did not have any concerns about issues of aggression or violence in Swindle's behavior. Kirkwood stated that in May 2009, the probation office received phone calls from both Gant and Swindle about "an altercation between the two of them" that had been reported to Rowlett police. Kirkwood

–14–

testified that other than that, she had not received any reports of Swindle being violent. She stated Gant never told her that Swindle had threatened to kill her.

According to Kirkwood, Swindle was assigned to a halfway house during her probation because of her inability to maintain stable employment. An incident at the halfway house involving "technical violations" was reported to a judge and Swindle was ordered to enter an in-patient treatment program. Kirkwood testified Swindle "self-disclosed" some alcohol issues, episodic use of cocaine with John Gant, and abuse of prescription medication. Additionally, Kirkwood testified that during her probation, Swindle was arrested for public lewdness, for which she received a county probation term. Kirkwood stated that in early April 2010, she had a "very pleasant" conversation with Swindle in which Swindle stated that her number one priority was that "she was trying to get all of her children together."

On cross-examination, Kirkwood testified Swindle was with a convicted felon when she was arrested for public lewdness. Further, Kirkwood testified she did not have any documentation with her that showed how often Swindle had been tested for drugs.

Outside the presence of the jury, appellant requested jury instructions on necessity and defense of a third person. Appellant's counsel argued that an instruction on defense of a third person was proper because such defense had been raised by the following evidence: (1) Gant testified Swindle had threatened to kill her in the past and appellant was aware of that threat, (2) an "assault between [Gant] and [Swindle]" occurred, of which appellant was aware, (3) Swindle went to appellant's residence against Waters's recommendation and took photographs and questioned appellant's neighbors about him, (4) Swindle refused to leave when appellant demanded that she do so, and (5) appellant testified Swindle entered onto his property as he was walking back to his house, called him a "son-of-a-bitch," and stated she was "taking the baby." The State responded that a jury instruction on defense of a third person was inapplicable because

–15–

appellant (1) "provoked it" when he struck Swindle in her car in a public area and (2) left the scene and returned with a weapon.

The trial court considered and denied appellant's requested jury instructions on necessity and defense of a third person. Then, following the jury's return to the courtroom, both sides presented closing argument and the case was submitted to the jury. Following the jury's finding of guilt, the punishment phase of trial commenced.

The State called Swindle's brother and mother as witnesses. Both testified as to the effect Swindle's death has had on them.

The defense called McClung, who testified he had performed a mental health evaluation on appellant following the event in question. McClung testified appellant was "very depressed" and "has a history of someone who's been depressed for years." Additionally, McClung testified appellant has a "generalized anxiety disorder." According to McClung, appellant's father was an alcoholic who was abusive to appellant, appellant's brother, and appellant's mother. McClung stated appellant felt he had to take on the role of a "protector." He testified appellant "avoids any kind of confrontation," but "can be, when provoked, aggressive." McClung stated that in his opinion, the risk was low that appellant would be a danger to the community in the future.

According to McClung, becoming a father to Jaelyn made a "tremendous difference" in appellant's life and gave his life purpose. McClung stated appellant "feared greatly that he and [Gant] would lose the child to a situation in which there wouldn't be a good outcome."

McClung testified that at the time of the incident in question, appellant had been using a medication called Chantix to help him stop smoking. According to McClung, "one of the outcomes that very often does happen when somebody takes this medication is they do get violent." McClung stated he believes Chantix played a role in appellant's mental and emotional state at the time of the shooting.

–16–

McClung testified that on the date of the shooting, appellant felt "violated" and "terrified" as a result of Swindle's actions and words and "could see nothing else to do other than take some sort of action." Further, McClung stated, "I think at that point, once he had the gun, I think—I think any real clear thinking was just not part of him." According to McClung, appellant was unable to act rationally at that point and was "definitely acting on impulse." Additionally, McClung stated that in his opinion, appellant was sincerely remorseful.

Several people who had worked with appellant prior to the events in question testified he was a pleasant, caring, helpful person. Then, both sides closed and the trial court read the punishment charge to the jury. The jury was instructed by the trial court, in part, "You will first answer the special issue, which is do you the jury find by preponderance of the evidence that the defendant caused the death of Dana Swindle under the immediate influence of sudden passion arising from an adequate cause."

The jury answered "no" to the "special issue" on sudden passion and assessed punishment as described above. This appeal timely followed.

## II. APPELLANT'S ISSUES

### A. *Exclusion of Evidence*

#### 1. Standard of Review

We review the trial court's exclusion of evidence, including expert testimony, under an abuse of discretion standard. *See, e.g., McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). This standard requires an appellate court to uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *See id.; Robbins v. State*, 88 S.W.3d 256, 260 (Tex. Crim. App. 2002).

#### 2. Applicable Law

Ordinarily, the defendant is the only permissible source of evidence of his or her state of mind at the time an offense is committed. *See Osby v. State*, 939 S.W.2d 787, 791 (Tex. App.—Fort Worth 1997, pet. ref'd). However, in the trial of a murder case in which self-defense is raised, article 38.36(b)(2) of the Texas Code of Criminal Procedure authorizes admission of "relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense" if the defendant had been a victim of family violence as defined in the family code committed by the deceased. TEX. CODE CRIM. PROC. ANN. art. 38.36(b)(2) (West 2005);[1] *see Avila v. State*, 954 S.W.2d 830, 840–41 (Tex. App.—El Paso 1997, pet. ref'd) (citing *Osby*, 939 S.W.2d at 790–91); *Coleman v. State*, No. 05-01-01662-CR, 2003 WL 1059641, at *2 (Tex. App.—Dallas Mar. 12, 2003, pet. ref'd).

### 3. Application of Law to Facts

#### a. Expert Opinion Evidence

We begin with appellant's fifth issue, in which he contends the trial court erred by excluding his proffered expert opinion evidence, i.e. the testimony of McClung, during the guilt/innocence phase of trial. The State responds that "the trial court did not abuse its discretion in excluding the expert's opinion regarding Appellant's state of mind at the time of the killing

---

[1] Article 38.36 states in its entirety

(a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

(b) In a prosecution for murder, if a defendant raises as a defense a justification provided by Section 9.31, 9.32, or 9.33, Penal Code, the defendant, in order to establish the defendant's reasonable belief that use of force or deadly force was immediately necessary, shall be permitted to offer:

(1) relevant evidence that the defendant had been the victim of acts of family violence committed by the deceased, as family violence is defined by Section 71.004, Family Code; and

(2) relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to family violence that are the basis of the expert's opinion.

TEX. CODE CRIM. PROC. ANN. art. 38.36.

because Appellant was not the victim of domestic violence by [Swindle], the victim, as required by art. 38.36."

The record shows no evidence that appellant had been the victim of acts of family violence committed by the deceased. Therefore, the expert testimony in question, which was specifically offered by appellant to show his "state of mind" pursuant to article 38.36, is not admissible.[2] *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(b)(2); *Avila*, 954 S.W.2d at 840–41 (concluding article 38.36 was not intended to allow expert testimony concerning state of mind of defendant unless such testimony related to previous domestic relationship between deceased and accused); *Coleman*, 2003 WL 1059641, at *2 (article 38.36 inapplicable to expert testimony as to mental state of defendant where no family violence by deceased against defendant).

We decide against appellant on his fifth issue.

b. Evidence Relative to Relationship Between Appellant and Swindle

In his fourth issue, appellant asserts "[t]he trial court erred in overruling appellant's proffer of evidence relative to the relationship of the parties pursuant to article 38.36 code of criminal procedure." Appellant cites generally to pages 64–87 of volume four of the reporter's record, which contain the proffered testimony of Gant described above respecting (1) a 2009 "pushing incident" involving Gant and Swindle, (2) a death threat made by Swindle to Gant during a phone call in 2009, (3) drug use by Swindle reported to Gant by another person, (4) Swindle "spending time with people of dangerous character," and (5) Swindle driving down the alley behind Gant's house several times with a person who had a criminal history. However, in his appellate argument, appellant specifically directs this Court to the proffered testimony of

---

[2] To the extent appellant asserts arguments in his appellate brief respecting admission of expert testimony to show mental illness and diminished capacity, such grounds for admissibility were not asserted in the trial court. *See* TEX. R. APP. P. 33.1. Further, appellant does not explain, and the record does not show, how such arguments pertain to the evidence in question, which was offered specifically to show appellant's "state of mind." *See* TEX. R. APP. P. 38.1(i).

Gant "about [Swindle's] conduct and statements that showed the victim's previous violent acts that [sic] she was the first aggressor."

The State asserts "[t]he trial court did not abuse its discretion in excluding the proffered evidence of [Swindle's] alleged violent nature since the proffered evidence was later admitted."

Appellant references article 38.36 in stating his fourth issue, but does not otherwise cite or discuss article 38.36 in his appellate brief as to that issue. Rather, appellant quotes a lengthy excerpt from a case involving a discussion of Texas Rule of Evidence 404, which provides in part for admissibility of "evidence of a pertinent character trait of the victim of a crime offered by an accused." *See* TEX. R. EVID. 404(a)(2). Further, appellant does not identify the specific testimony that was allegedly erroneously excluded. However, regardless of the authority appellant relies upon, we cannot agree the trial court erred by excluding testimony of Swindle's "previous violent acts." The record shows the proffered testimony of Gant included two violent acts: (1) a 2009 "pushing incident" involving Gant and Swindle and (2) a death threat made by Swindle to Gant during a phone call in 2009. The trial court allowed Gant to testify as to the "pushing incident" during her direct examination. Additionally, while Gant's testimony pertaining to the death threat was initially excluded, the trial court later allowed Gant to testify about that threat. As stated above, appellant does not describe, and the record does not show, any other "violent acts" of Swindle as to which Gant's testimony was excluded.[3]

We decide appellant's fourth issue against him.

---

[3] To the extent appellant's issue can be construed to complain as to the exclusion of Gant's testimony pertaining to Swindle's drug use and association with a criminal, (1) Knouse testified Swindle had been incarcerated on a drug charge and (2) Kirkwood testified Swindle "self-disclosed" drug use while on probation and was with a convicted felon when she was arrested for public lewdness. Therefore, any error in the exclusion of such testimony was harmless. *See* TEX. R. APP. P. 44.2.

–20–

## B. Sufficiency of the Evidence

### 1. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under the single sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, No. PD-0308-12, 2013 WL 690854 at *2 (Tex. Crim. App. Feb. 27, 2013); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under that standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Matlock*, 2013 WL 690854, at *2. We review all of the evidence, whether it was properly or improperly admitted. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are equally probative, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*; *Patrick v. State*, 906 S.W.2d 481, 488 (Tex. Crim. App. 1995). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319; *Young v. State*, 283 S.W.3d 854, 861 (Tex. Crim. App. 2009). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 319.

In reviewing a jury's rejection of an affirmative defense in a criminal case, we use the traditional Texas civil burdens of proof and standards of review. *Matlock*, 2013 WL 690854, at *3. When an appellant asserts that the evidence is legally insufficient to support an adverse finding on an affirmative defense, we construe the issue as an assertion that the contrary was established as a matter of law. *Id.* We first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable fact-finder could not. *Id.* If we find no evidence supporting the finding, we then determine whether the contrary was established

as a matter of law. *Id.* Only if the appealing party establishes that the evidence conclusively proves his affirmative defense and "that no reasonable jury was free to think otherwise" may the reviewing court conclude that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense. *Id.* at *4. A defendant is entitled to an acquittal on appeal despite the jury's adverse finding on his affirmative defense only if the evidence conclusively establishes his affirmative defense under the two-step test described above. *Id.*

A defendant might also raise a factual-sufficiency challenge to the jury's adverse finding on his affirmative defense. *Id.* In making a factual-sufficiency claim, the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on his affirmative defense was so "against the great weight and preponderance" of that evidence to be manifestly unjust. *Id.* In the factual-sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.* Therefore, an appellate court may sustain a defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.* If an appellate court conducting a factual-sufficiency review finds that the evidence supporting the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the appellate court may reverse the trial court's judgment and remand the case for a new trial. *Id.* The remedy in both civil and criminal cases for an appellate reversal based upon a factual-sufficiency claim that the jury's verdict is against the great weight of the evidence is a new trial, not an acquittal. *Id.*

## 2. Applicable Law

A person commits murder by intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Typically, murder is a first-degree felony. *Id*. § 19.02(c). However, at the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. *Id*. § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree. *Id*. § 19.02(d).

"Adequate cause" means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id*. § 19.02(a)(1). The accused may not rely upon a cause of his own making, such as precipitating a confrontation. *See Naasz v. State*, 974 S.W.2d 418, 423 (Tex. App.—Dallas 1998, pet. ref'd); *Trevino v. State*, 157 S.W.3d 818, 822 (Tex. App.—Fort Worth 2005, no pet.). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2); *see also McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating that a defendant raising sudden passion to mitigate a murder conviction must prove that there was an adequate provocation, that a "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide").

3. Analysis

a. Sufficiency of the Evidence to Support Appellant's Conviction

In his first issue, appellant contends the evidence is insufficient to support his conviction for murder. Appellant asserts that while he testified he shot the deceased, he "did not have any intention of shooting her and killing her." Further, according to appellant, he did not recall shooting the deceased and "was acting under the duress of the threatening situation of having his child taken from him compounded with the effects of the drug Chantix at the time of the incident." Appellant contends the record establishes, at best, a "mere modicum" of evidence of his guilt and "no rational trier of fact could have found beyond a reasonable doubt that Appellant was guilty of the murder."

The State responds that the evidence shows appellant intentionally shot and killed Swindle and is thus sufficient to support appellant's conviction.

The record shows that at the time Swindle was shot by appellant, she was standing in the yard of appellant's neighbor talking to a 911 operator on a cell phone. Swindle did not have a weapon. Additionally, Knouse, Parker, Gayford, and Christensen testified Swindle was not attacking appellant at the time of the shooting. They testified appellant approached a vehicle in which Swindle was sitting and wrestled with Swindle over a cell phone. Then, appellant walked into his house. He came out a short time later, walked toward Swindle, and began shooting. Appellant shot Swindle while she was standing, then shot her several more times after she fell to the ground.

Appellant argues that at the time of the shooting, there was a "perfect storm" of events occurring in his life that led to the "unintentional shooting." Appellant contends he "was fearful for his wife, he was fearful that Jaelyn would be taken away from them and given to an unfit mother, he was suffering from depression, unable to sleep, and most importantly under the

–24–

influence of the drug Chantix which is documented to cause people to become violent." However, while appellant proffered testimony of McClung that Chantix can cause violent behavior in some users, we concluded above that McClung's testimony was properly excluded during the guilt/innocence phase of trial. The record shows that the only evidence involving Chantix that was before the jury during the guilt/innocence phase of trial was appellant's testimony that he was taking Chantix to help him stop smoking. *See Caines v. State*, Nos. 14-11-00912-CR & 14-11-00913-CR, 2013 WL 176027, at *3 (Tex. App.—Houston [14th Dist.] Jan. 17, 2013, no pet.) (mem. op., not designated for publication) ("In our review of the sufficiency of the evidence supporting appellant's convictions, we consider only the evidence admitted in the guilt/innocence phase of trial, and not the evidence presented in the punishment phase of trial.") (citing *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000)). On this record, viewing the evidence in the light most favorable to the verdict, we conclude a rational jury could have found the essential elements of murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Matlock*, 2013 WL 690854, at *2.

We decide appellant's first issue against him.

### b. Sufficiency of the Evidence to Support Negative Finding on Sudden Passion

#### i. Legal Sufficiency

In his second issue, appellant contends he "proved that he caused the death while he was under the influence of sudden passion arising from an adequate cause and that the jury's negative answer to that special issue was against the legal sufficiency of the evidence presented by appellant in the punishment stage of trial." Appellant argues (1) there was no evidence of any violence perpetrated on the victim by him prior to the killing, (2) there was no testimony or evidence presented that he planned the murder of Swindle, and (3) after the incident, he was "devastated by what had happened."

The State responds that appellant did not prove sudden passion as a matter of law.

As described above, the evidence showed Swindle had no weapon. Further, there was testimony that (1) appellant approached a vehicle in which Swindle was sitting and wrestled with Swindle over a cell phone; (2) appellant then walked into his house, came out a short time later, walked toward Swindle, and began shooting; (3) Swindle was not attacking appellant and did not appear to pose a threat to appellant at the time of the shooting; and (4) appellant shot Swindle while she was standing, then shot her several more times after she fell to the ground. There is no evidence in the record that Gant was outside the house at any time during the incident in question.

"Sudden passion" requires "provocation by the individual killed . . . which passion arises at the time of the offense and is not solely the result of former provocation." *See* TEX. PENAL CODE ANN. § 19.02(a)(2). On this record, we cannot agree with appellant that there was no evidence supporting the jury's finding of no sudden passion and that the contrary was established as a matter of law. *See Matlock*, 2013 WL 690854, at *3–4.

We decide against appellant on his second issue.

### ii. Factual Sufficiency

In his third issue, appellant contends the evidence was not factually sufficient to support the jury's negative finding on sudden passion arising from an adequate cause. Appellant states in his appellate brief that he "incorporates herein the reasons and aforementioned factual discussion of why the jury's verdict of 'no' is clearly wrong and unjust applying the factual sufficient standards of review." The State responds that "the jury properly rejected Appellant's claim of sudden passion, as was its prerogative as fact-finder."

As described above, there is testimony in the record that Swindle did not have a weapon, was not attacking appellant, and did not appear to pose a threat to appellant at the time of the

shooting. Further, the record contains no evidence that Gant was outside the house at any time during the incident in question.

Appellant testified that as he was walking into his house after taking Swindle's cell phone, Swindle exited the vehicle in which she was sitting, stepped into his yard, and said (1) "Give me my phone back you son-of-a-bitch" and (2) "I'm taking Jaelyn. I'm taking my daughter." However, Knouse testified Swindle did not threaten appellant. Further, the jury was free to believe all, some, or none of the testimony presented. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997); *see also Matlock*, 2013 WL 690854, at \*4 (while appellate court views entirety of evidence in neutral light during factual sufficiency review, "it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony").

On this record, we cannot conclude the jury's finding of no sudden passion is "so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 2013 WL 690854, at \*4.

We decide appellant's third issue against him.

### *C. Appellant's Requested Jury Instruction on Affirmative Defenses*

#### 1. Standard of Review and Applicable Law

We review jury charge error under a two-step process. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge. *Id.* If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id.*

A trial court must submit a charge setting forth the "law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). It is well settled that a defendant has a right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or

–27–

strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006) (citing *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App.1999)). "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *see* TEX. PENAL CODE ANN. § 2.03(c) (West 2011) (defensive jury instruction not submitted to jury unless "evidence is admitted supporting the defense"); *Krajcovic v. State*, No. PD-1632-11, 2013 WL 811536 (Tex. Crim. App. Mar. 6, 2013) (remanding case because court of appeals "did not consider whether there was affirmative evidence to support a jury finding regarding the defense"). A trial court may refuse an instruction on a defensive theory if the issue was not raised by the evidence. *See Shaw*, 243 S.W.3d at 657–58; *Garza v. State*, 829 S.W.2d 291, 294 (Tex. App.—Dallas 1992, pet. ref'd).

Under section 9.31(a) of the Texas Penal Code, a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a). The use of force against another is not justified in response to verbal provocation alone. *Id*. § 9.31(b). Further, section 9.32(a) of the penal code provides

> (a) A person is justified in using deadly force against another:
>
> > (1) if the actor would be justified in using force against the other under Section 9.31; and
> >
> > (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
> >
> > > (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

–28–

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*Id*. § 9.32(a); *see also id*. § 9.01(3) ("deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury").  The actor's belief that the deadly force was "immediately necessary" is presumed to be reasonable if, *inter alia*, the actor (1) knew or had reason to believe that the person against whom the deadly force was used unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, (2) did not provoke the person against whom the force was used, and (3) was not otherwise engaged in criminal activity.  *Id*. § 9.32(b).

A person is justified in using force or deadly force against another to protect a third person if (1) "under the circumstances as the actor reasonably believes them to be, the actor would be justified under section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect," and (2) "the actor reasonably believes that his intervention is immediately necessary to protect the third person."  *Id*. § 9.33.

### 2. Analysis

In his sixth issue, appellant contends the trial court erred by overruling his requested jury instruction on the affirmative defenses of self-defense and defense of a third party in the guilt/innocence phase of trial.  The record shows appellant's counsel stated to the trial court that appellant was not asking for a jury charge on both self-defense and defense of a third person, but rather just on defense of a third person.  Therefore, appellant's contentions respecting self-defense have not been properly preserved for this Court's review.  *See* TEX. R. APP. P. 33.1(a).

According to appellant, defense of a third party was raised by the following evidence: (1) Gant testified Swindle had threatened and assaulted Gant in the past, (2) appellant testified he thought there was a "likelihood of a confrontation" between Gant and Swindle, and (3) appellant testified he worried about Gant's safety and thought if there was a "confrontation," Gant would be "on the losing end." Further, appellant argues "[t]he trial court's exclusion of Dr. Ray McClung's expert testimony directly affected the court's decision not to charge the jury on the justification defenses."

The State responds that the trial court correctly refused to give the requested instructions because appellant was not entitled to them. Specifically, the State asserts Swindle "was not using force or attempting to use force, much less deadly force, against Appellant or [Gant] or Jaelyn at the time of the shooting."

We concluded above that the trial court did not err by excluding McClung's testimony during the guilt/innocence phase of trial. The record shows Gant testified that during a phone conversation in 2009, Swindle threatened to kill her and appellant was aware of that threat. Appellant testified that after he took Swindle's cell phone and walked away from the vehicle in which Swindle was sitting, Swindle stepped out of the vehicle into his yard and said, "Give me my phone back you son-of-a-bitch" and "I'm taking Jaelyn. I'm taking my daughter." Then, appellant walked into his house, came out a short time later, walked toward Swindle, and began shooting. At the time of the shooting, Swindle was standing in the yard of appellant's neighbor talking to a 911 operator on a cell phone. Appellant shot Swindle as she was standing, then shot her several more times after she fell to the ground.

The record does not show Swindle was on appellant's property at the time she was shot or was using any type of force against anyone at that time. Further, the record contains no evidence that Swindle had a weapon or that Gant was outside the house at any time during the

incident in question. Additionally, Gant testified the threats against her were made by Swindle during the previous year. *See Cooper v. State*, 910 S.W.2d 605, 606 (Tex. App.—Tyler 1995, no pet.) (threats made at earlier instances too remote to create immediate danger); *Hart v. State*, No. 05-09-01058-CR, 2011 WL 2028216, at *10 (Tex. App.—Dallas May 25, 2011, no pet.) (not designated for publication) (same); *see also* TEX. PENAL CODE ANN. § 9.31(b) (use of force against another is not justified in response to verbal provocation alone). On this record, we conclude there is no evidence appellant "reasonably believe[d] that his intervention [was] immediately necessary" to protect Gant. *See* TEX. PENAL CODE ANN. § 9.33. Therefore, we conclude the trial court did not err by denying appellant's request for a jury instruction on defense of a third party.

We decide against appellant on his sixth issue.

### III. CONCLUSION

We decide appellant's six issues against him. The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2
111334F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

PAUL THOMAS GILLAM, Appellant

No. 05-11-01334-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F10-47328-U.
Opinion delivered by Justice Lang, Justices Francis and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 16th day of April, 2013.


/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE